Your argument of the day, Hassan, I hope I pronounced that right, versus AIG, that's number 18-1309. Did I pronounce the name correctly? Hassan. May it please the Court, I'm Glenn Merrick, representing the Plaintiff Appellants Mollick and Sini Hassan. This is a case coming up on appeal from a summary judgment order entered by the Honorable Damon Moore in the Federal District Court in Denver. The case was a case brought under an insurance policy whereby the Hassans had been insured by AIG under what's called a private collection policy. The private collection policy was enforced. There are certain matters that are certainly not disputed by the parties. The parties do not dispute that there was insurance in place issued by AIG which covered private collections, including collections of wine. The parties do not dispute that the wine coverage was for wine which was owned anywhere in the world and commenced at the time that the wine was acquired, whether it was in place someplace or in transit. As long as the Hassans had title to it, essentially, is that right? Well, the policy actually requires that the Hassans have possession, title, or coming to title to the wine. Or what was the last thing? Coming to title. Title is transferred to them. So possession or title, essentially. The policy was issued and what happened in this case is there had been a course of dealing between the Hassans, Dr. Hassan being something of an aficionado of wine, and he had been collecting for decades. He had been dealing with this particular merchant, which was called Premier Cru, since 2000. In that period of time, a course of dealing had been developed between the parties under which Dr. Hassan would place orders. Those orders were paid in full at the time the order was placed. The title would pass to the Hassans as the order was placed. Typically, the wines would be delivered over a period of time, frequently, in fact, with some regularity, substantially after the orders were placed. Sometimes the wines would be in stock at Premier Cru, that is, in the warehouse or in the retail facility in Berkeley, California. Other times, Premier Cru would place orders for the wine with premier wineries located throughout the world. There was some mention of wine futures in connection with the transactions with Premier Cru, right? That is correct. Now, is it the case that the Hassans actually bought the wine or bought – in other words, paid the money that they were paying saying, I am buying this wine, so when this wine becomes available, you owe me that bottle of wine. Or I saw language to the effect they were buying a right to buy the wine. Which one was it? They're both. So what happened is sometimes when the Hassans purchased the wine, the wine would be in inventory, if you will, in stock in Berkeley, either in the retail facility or in the warehouse facility. On other occasions, Premier Cru, acting as agent for the Hassans who had already purchased the wine from Premier Cru, Premier Cru would in turn place orders with wineries located throughout the world. I got it. But in the latter scenario, it is not a situation where Premier Cru would be looking to them for additional money for that bottle of wine once they acquired it, right? Correct. So the amount that they were paying, they were paying for a future acquisition, but that didn't mean they would owe additional money as a consequence. Correct. Absolutely correct. Okay. Because the order was paid for in full when the order was placed. Okay. And so at that point in time, Premier Cru would be acting as agents for the Hassans, placing the orders with wineries if they weren't already in stock. Now, what happened in this particular case was Premier Cru filed for relief under Chapter 7 of the Federal Bankruptcy Code in California, Berkeley, in January of 2016. At that point in time, the Hassans had yet to have delivered to them some 2,448 bottles of wine. A claim was filed in the bankruptcy proceedings by the Hassans on account of their purchase price, the amount that they had paid Premier Cru. Later, the Hassans filed a claim against AIG, who was the insurer under the policy for the fair market value of the wine. Premier Cru – I'm sorry, AIG, who was the insurer, denied coverage in June of 2016. At that point in time, suit was brought in the federal – in state court, removed to the federal district court and to Judge Moore's courtroom. So let me just ask you a question about that. The complaint that was filed in district court referred to the Hassans' residency. It did not refer to their domicile. Domicile is the operative factor for the diversity jurisdiction. And so was there ever a determination made as to the Hassans' domicile either by the district court or by some representations that were made in connection with the district court litigation so that it is clear to us that the district court had jurisdiction over this matter and it is clear to us that we derivatives have jurisdiction over it as well? No. Okay. And you stand here now and what is it you want to tell us as a consequence of that? So let me be a little less glib about it, but I want to answer your question directly. The allegations in the complaint in the Denver district court were the Hassans were residents of the state of Colorado. And the allegation were that they were residents of the state of Colorado and they are part-time residents in the state of Nevada as well. It was the defendant that removed alleging that the Hassans were domicilaries of the state of Colorado. Well, I'm not even sure that the defendant put that in their notice. I mean, I look back at the notice, the notice reference, I think they were residents. And even if it did, I mean, are you representing to us that they in fact are domiciled in the state of Colorado? Yes. Okay. Bill, you have me at a disadvantage. I don't have the removal paper in front of me, but I don't believe that was alleged in the complaint, which was what I thought. It wasn't. That's what I thought you were asking me. Okay. Okay. So if I may return to where I was. So a suit was brought in the federal district, was brought to state court, moved to the federal district court, and the issue was on summary judgment whether or not AIG should prevail as a matter of law. And Judge Moore looked at it from two perspectives. He said, number one, the question is, do the Hassans own or possess the wine? And two, was there, in the terms of the policy, was there a direct loss or damage to the wine? Interestingly, Judge Moore, for reasons which are not clear from the order itself, goes on to say, and it seems sort of anomalous, frankly, Judge Moore made a determination with all that was lost was money. And Judge Moore says, but plaintiffs, and I'm reading from page eight of his order, but plaintiffs completely failed to present any evidence that the wine they sought to purchase suffered a distinct, demonstrable, or physical alteration, suggesting that the policy, and he says this several times in his order, he says it on page nine as well. Plaintiff's claim is not for the value of the wine that has been delivered, not for a physical damage to the wine, he says on page nine at the bottom. And plaintiffs do not argue, allege, or present any evidence that the wine alleged to be in existence has suffered a distinct, demonstrable, or physical alteration. So, for reasons that are not clear, Judge Moore, in his summary judgment order, seems to believe that in order for the plaintiffs to prevail, they must demonstrate that there's been an alteration to the wine product. That's exactly what he's saying, and Couch on Insurance has read that language that's in the policy to require exactly that. Well, what the policy says is that it is covered for loss or damage. Direct physical, what is the, exactly? Direct physical loss or damage. Okay, direct physical loss or damage. Well, does the physical have any meaning in that phrase? Physical as it relates to the product in question, so direct physical loss or damage, so direct, it's, it's, you physically have it, it's lost, or it's damaged. I assume that the word loss means something as well, Your Honor, and that's what we're talking about. Now, if the wine had been stolen, is it not covered by the insurance policy? It hasn't suffered any alteration. I would like to be clear what you're saying the loss is. First, there's one fact I'd like to get clear. Please, please. Your brief talks about deliveries that were supposed to be in November and December of 2016. Is that a typo? Shouldn't that be 2015? It is not. After they declared bankruptcy, 10 months after bankruptcy, they're talking about deliveries of wine? Correct. So, and I understand. Okay, as long as that's not a typo. Because what's happening is, remember what happens is, Premier Crew goes out and purchases wine and buys them from wineries for delivery, which is coming in the future. So the wines keep coming into Premier Crew, notwithstanding the filing of the bankruptcy. What happened to that wine? Do you have any idea? The trustee did not provide any inventory of it as yet. In other words, it's up to the trustee. So, but what, you're not claiming that you can recover on the policy just on the basis of being victims of a Ponzi scheme where wine wasn't bought that you paid for, or that the same bottle of wine was sold to several different people. Are you? Are you claiming that's a loss? Or is it something else that you're seeking recovery for? Because that's not clear to me. And I apologize for the ambiguity. What we're saying here is not that if money was given to Premier Crew, and Premier Crew put it in his pocket and went on a world tour or something, and never purchased any wine, that clearly that is not covered by the policy. That's not a loss. That is not what we're saying. But that is clearly what did not happen. Okay, what are you saying, what bottles of wine are you saying were lost? The bottles of wine that were purchased for the Hassans. There was a pattern and practice. Can you identify, because there was an inventory of the warehouse in January of 2016 or within a few months of that. The recollection is correct. And the settlement document describes how those bottles were accounted for. And there were a few that could be identified to specific purchasers. Most of it was not, as I understood it. Some was identified as being sold multiple times, the same bottle to several people. Now, with respect to what the trustee inventoried, are any of those bottles, bottles you're claiming were lost and that you're entitled to recover from? Yes. Now, what's the evidence that any of those bottles were owned by the Hassans, contrary to what the trustee says in the inventory? So, that's not what the trustee says in the inventory, nor what the trustee's inventory says. So, what happens is that when the trustee, I'm talking about the Chapter 7 trustee, does an inventory in January of 2016, he discovers two things. Prior to the trustee assuming control of the premises, some of the bottles had been physically set aside, earmarked or set aside as the Hassans' bottles. That process was underway when the bankruptcy filing occurred. That process ceased because the trustee assumed control of the premises. When the trustee conducted the inventory, the trustee noted that the process was underway and that some of the bottles had been set aside as belonging to the Hassans or being earmarked for the Hassans. There was a warehouse of 79,000 bottles of wine and there was future shipments coming into the warehouse which had not yet been inventoried because they had not yet arrived. So, those are the containers that you're referring to in 2016. With respect to the bottles that were in the warehouse, the bottles that were in the warehouse dramatically overlapped with what the Hassans had ordered. They ordered three bottles of 1975 whatever vineyard and there were some bottles like that in the warehouse. But the trustee, for the most part, couldn't identify those bottles as being ordered for a particular person. Some for multiple people, some not identified at all. Is that correct? I think the term that was used is oversubscribed. That was the term that was used in the paper. So, what happens here is if you take a look at the inventory by the trustee, the inventory will demonstrate that there's a remarkable correspondence between what the Hassans had ordered. I would like to get straight what the facts are and what you're claiming, so please continue. Thank you. So, there's a correspondence between what the Hassans had ordered and what is found in the inventory. That goes to the issue… Only in the sense that they ordered bottles of a certain year from a certain vineyard of a certain type and there were some bottles of that type in the warehouse. Is that what you mean by correspondence? That is what I mean and that were in the process of being set aside that was halted when the bankruptcy began. So, there is a correspondence in that sense of the term between what the Hassans ordered and what is found in the inventory. Well, the trustee was looking at the records of the retailer. Conducting a physical inspection. Yeah, but also comparing that to the records to see who could be identified with. And do you have any evidence that the trustee was incorrect? Or are you saying that even if the trustee is correct about how it identified the bottles, that you're still entitled to recover? That's what I'm not sure. We're entitled to recover. Take the following example. For what? I mean, you have to show that some of these bottles were the Hassans. Yes. The trustee identified what it could and said some of these are Hassans. The great bulk are not. What's the evidence that the trustee was wrong in that regard? We're not saying that the trustee is wrong. That's an issue of ownership. Remember, the trial court said there's no evidence of loss. There is loss. Somebody has lost something because the bottles are not delivered to them. They exist. Well, it matters whether it's lost money or lost bottles. These are lost bottles. So you have to identify some bottles that were lost. And all you're saying is they always delivered sometimes late. Your affidavit is totally consistent with being victims of a Ponzi scheme. So I'm interested in what evidence you have of specific bottles that were identified to the Hassans that have disappeared in some way. The evidence is, and I apologize for repeating, but the evidence is that the Hassans' bottles were in the process of being set aside to them. The inventory in the warehouse is consistent with what the Hassans' orders were. And the bottles exist. It's not like there wasn't a loss. The bottles do exist. The question is ownership. Can I ask you a question? Yeah, please. So, I mean, don't you have to use this evidentiary presumption to get to the bottles existing, right? The idea that Fox and Premier Crew always delivered to your client when they placed an order. I mean, so to get to the idea that the bottles that you're talking about are yours, we have to first buy into the idea that Fox and Premier Crew acted in conformance with a past practice. Yes. Okay. And can that 406 presumption stand up when you have an express under oath statement by Fox saying that he duped your client, that he didn't get the bottles? Well, let's be careful about that under oath statement. That was a part of a sentencing, which we weren't present. Well, it's a pretty solemn occasion, right? He's going to prison, presumably, over it. I'm not challenging that it's a solemn occasion. I'm just saying that it is gross hearsay from our perspective because we weren't there. Hold on. Hold on. It's not hearsay. I mean, he's under oath making a statement to the court. I mean, it's his statement. He's talking about what he did. How do I cross examine that? You don't necessarily get to. But that doesn't mean it's hearsay. It means it's maybe untested. With respect to that, I don't believe that it falls within any of the exceptions to 803, under 803. But I don't mean to challenge the court about that. My point that I'm making here is that the bottles do exist. The question of whether or not there's been loss is do the bottles exist? Because if all they did, if this was just an economic scam, if that's all that happened, then Fox and his cronies at Premier Crew would never have purchased any bottles. They did purchase bottles. There's lots of bottles out there. There's tons of bottles out there. The question is ownership of the bottles. Well, if it's a proxy scheme, you have to be taking care of earlier purchasers, earlier investors. So, of course, they had to have bottles. They get later and later in delivery because they've got... Correct. And at the end, the question is when there is insufficient bottles at the end in a Ponzi scheme, if that's what was going on, if that's what's going on, at the end the question is whose ox got gored? Because some bottles were purchased. Consider, for example, the following example, just a simple example. There's one bottle of wine. There are two purchasers and there are two insurance companies. Let's say Fox says, I bought this bottle for A, customer A, who's insured by an insurance company. Customer B also purchased the bottle, but Fox didn't buy his bottles. He bought customer A's bottles. He used B's money to buy the bottle for A. So if A got that money, he should have to, what's the word, call back. I would think the other investor would have a right to call it back from him. So he's not going to get anything out of it. But as with respect to the insurance, I'm not talking about the bankruptcy powers. I'm talking about from the insurance perspective. From the insurance perspective, A bought the bottle. It was bought for him. He never got the bottle. The insurance company insured him for getting the bottle. He didn't get the bottle. You mean if customer B comes along and buys a similar bottle and gets ripped off by Fox, he denudes the coverage? It's a question of ownership. Wait a minute. In your hypothetical, it would seem to me that A, who Fox bought the bottle for, would get coverage. B would not get coverage. And in that example, in your hypothetical, you're B. No, I'm A. Because Fox said under oath that he didn't buy your bottles. Fox said Hassan was one of the victims. He didn't say, I didn't buy 2448 bottles. He didn't say, I didn't buy a single bottle for you. That's an assumption that Fox said. Now it's beyond what he said. Because what happens there is Fox is attributed with the statement that I didn't buy any of the 2448 bottles. And with respect, I don't think you'll find that anywhere in the sentencing memo. You've been very kind and very charitable. Thank you so much. Good morning, Your Honor. Morning. Lawrence McAfee, appearing on behalf of AIG Property Casualty Company. One of the questions that you posed to counsel was with respect to, I think it's called segregated bottles in the bankruptcy stipulation, which was entered into eventually by Dr. Hassan and his wife. And that stipulation indicates that where there are bottles that could be segregated as to a specific person or purchaser, that that individual could purchase from the estate that wine for 20% of what he paid for and plus tax. That was done here with respect to some of the bottles. The rest of the bottles, the rest of the 78,000 bottles that were actually in the inventory in California, were the subject matter of a class action and then an objection by Dr. Hassan and then eventually an agreement to be bound by and opting into, if you will, the class and the stipulation. So the bottles at issue here do not include the bottles that he purchased subject to that segregation? Correct, Your Honor. Okay. These bottles are of two types. The first type are bottles that were actually among the 78,000 that were actually physically located in the warehouse. Those bottles were sold. As part of that sale, Dr. Hassan and other members of the class assigned any rights that they may have had, and I don't know that they had any, but they may have had to those 78,000 bottles. And then they were treated as general creditors and they were given a… Was any attempt made to determine if those 78,000 bottles could be attributed to any particular purchaser? That was part, I believe, of what the settlement and the stipulation were all about. They had various categories, one of them being segregated bottles. How was that determined, though, which category each bottle belonged to? How could they say that this is a segregated bottle that the Hassans have, this is nobody's? I'm not sure of the actual process, but it was a process that was conducted by the trustee on behalf of the estate and that was agreed to by the appellant here. So the bottom line is that there were some that the trustee determined were clearly segregated out to be the Hassans, allowed them to purchase them. Then there was this whole warehouse full of wine that was, at least as far as the trustee was concerned, could not be identified to any particular person, and the Hassans' claim to wine that is at issue here relates to that sea of wine, right? We don't know that. They claim their wine is in there. Well, no, I don't think they make that statement, Your Honor. I think what they say is that perhaps some of that was wine that was theirs, but the other, the vast majority of it, was wine that they euphemistically called wine futures. And what that was, and this is in Fox's statement in his sentencing hearing, was wine that either Fox never ordered from the wineries in France or wine that he ordered and then changed the purchase order so that he, say, bought 1,000 bottles and only bought 100 bottles. So those are the wine future, generally speaking, that classification. In that instance, they never really, well, in some instances, there was wine that was never purchased in that context. Correct. Okay, so it's both a claim against this unsegregated bottles of wine, some of that is mine, and then some of it is this future-oriented wine. Correct, and with respect to the wine, the 78,000 bottles located physically in the warehouse, they transferred their rights and or assigned their rights to the trustee. The trustee sold that wine. They have no ownership interest in that wine. With respect to the wine futures, I mean, those were, what's the best word? Ephemeral, you know, possibility that they would ever be received. They never were. I apologize, I interrupted you, but I think you're just about done. Let me ask you, what about these purported deliveries in November and December of 2016? Is there any evidence that that happened? Because that's several months after the settlement. There's no indication whatsoever, and that's completely speculative on the part of Dr. Hassan based, he says, on statements that were made to him by Mr. Fox. So Mr. Fox said, I'm expecting some deliveries at that point. Does he say when the statements were made by Mr. Fox? Is this something said before the bankruptcy or after the bankruptcy? Do we even know that? It had to be after the bankruptcy, I believe, because the bankruptcy was filed in January of 2016. But maybe in December 2015 he said, I'm expecting, this is for delivery in a year from now. I think that the only evidence that we have of that, if you want to call it evidence, is the self-serving statements contained in the affidavit of Dr. Hassan, which are uncorroborated. There's no purchase orders. There's no anything. There's no indication from any, I think they're called negotiations, that are the people that are the go-betweens between Fox and France to get wine from, expensive wines from these vineyards. I take it, at least with a fine point on it from your opponent, what I understood him to say is that the way he wins is if there are bottles of wine that essentially are his. I mean Mr. Hassan has bottles of wine that are his and that they can be identified to be his. Now, that being the case, you have both, we're talking about this sea of wine, the 72,000 bottles in which they assign whatever interest they have. So it has never been determined that they had any interest in those 72,000 bottles, right? And then there are the futures, which is, to use your word for the moment, the ephemeral interest in wine, which may or may not have been purchased. Correct. Okay. So we're left with a situation where the trial court, Judge Moore, made a determination. He didn't really begin to the issue of ownership. He just said there's no evidence, no evidence of demonstrable physical alteration of wine, which is what this policy provided coverage for. It's a collections policy. That would connote to me that you would have it. It's not something that provides coverage for a scheme like this, a Ponzi scheme, where you are duped into paying money for something that you never get. Well, that you have it, but is Judge Moore right that you would have to have some alteration to it? Yes. Because, I mean, to use an adversary counsel's point, why couldn't you have it and it be lost? But you have to have it in the first place, Your Honor. So there's no indication. But, I mean, I'm trying to just explore the merit of Judge Moore's rationale. I mean, is it the case that you would have to have damage or alteration to it? Couldn't you? If they could identify wine, in other words, if they could trace that wine to themselves, if that wine had been lost, would you still be denying them coverage? If it was actually in their possession, no. No, not in their possession, because I thought the policy covered the wine wherever the wine was. Well, it does, but it assumes that you own it. Well, then we'd be dealing with an ownership issue then. But the point is, if they had wine that they could trace to say they bought it, they would not have to have had damage or alteration to it if that wine was lost. Yes, but I think the step that I would take before I got to that point was, did they own it? Yes, but ownership, I'm just trying to explore Judge Moore's rationale, because ownership wasn't part of his rationale. Correct. And so it seems to me a piece of his rationale that is missing is the loss aspect. We'd have to reach the ownership issue, but if they could claim that that wine out there could be identified to me, and that wine was lost, then the question would become, did they own it? But I want to make this point, and it was a point that was made by counsel in his argument in their brief, and that is this in-transit argument. And frankly, these wines were purchased between 2008 and 2015, and I think it stretches credulity to say that they're in-transit for that long a period of time, but the policy does not provide coverage for in-transit. Counsel makes the statement that it expressly provides coverage for in-transit. Well, what if the wine was purchased and Dr. Hassan was supposed to take delivery in France, and in-transit to the U.S. it was lost? Well, we didn't have that fact scenario in the underlying case, and frankly the policy doesn't say that it provides coverage for that situation. It does not say that. Counsel says it says that, but it doesn't say that, and that issue of in-transit was only raised in one place in connection with their claim that somehow they were duped into or that they were not coerced, but part of the issue about buying the policy in the first place was it had this coverage. The policy doesn't have that coverage. Judge Moore found that the policy was unambiguous, and there's nothing in the policy about in-transit. This is some marketing. But that gets back to sort of where you own it, right? And it's worldwide policy, so if he owns it on a ship while it's being transported to him and it blows up, presumably there's coverage. I'm not saying he properly raised the in-transit idea. I'm not trying to box you in on that, but it just seems a little bit unfair to say that there's never any coverage when the wine's in transit because I think there is. I did not mean to imply that that was the case. If they have ownership of the wine and it's in transit, they're shipping it from France to the United States. I don't believe that there would be. There are two issues. One is what's the legal standard, and second, what's the evidence here? And I'd like to distinguish between those two because, as I understood, the argument on behalf of the Saens is if they had purchased a bottle of wine to come from this vineyard in France and it was purchased for them, it could be identified for them, and they could show that. But something's happened because it didn't show up at the warehouse, and the people in France say, yeah, we shipped that. Then if they could show that, I would think under the policy they had ownership and it was lost. I don't disagree with you. Okay. I think that that's – Okay. But we don't have those facts yet. Yes, but I'm not sure the two sides disagree on what the policy covers. It's a factual matter. Yes. And they're saying there are bottles that were identified to the Saens. We don't know what happened. Maybe something happened on the way to the warehouse. Maybe in the warehouse they got misplaced and sent to the wrong person or so on or something like that. I think there's a pretty good argument that if that were the facts, they could say that's my bottle that was lost and I'm covered. Do you disagree with that? I would not, but there was no – Yes. Okay. There was nothing, no presentation whatsoever. All the arguments seem to be on what the policy means, and I'm not sure how big a difference there is between the parties on what the policy means. It's what the facts are. Yeah. Correct. And there was no presentation of any fact in that regard. Well, they have their affidavit, and they say this is good evidence of habit and course of conduct, and we'll have to review that. But do you have good arguments against it? I mean, and the habit and custom, not to be flippant, but the habit and custom was to deliver wine except for the 2,448 bottles that weren't delivered. So I don't know what the evidence would prove, even if that were taken as so. It doesn't – I don't think it advances the ball. It does not indicate that that was what would have happened here because it didn't happen here. And frankly, because of the statements made by Fox, he duped 4,500 people, and Dr. Hassan and his wife were two of those 4,500 that lost a substantial amount of money as a result of this scheme. There's nothing further. Thank you very much. Thank you, Counsel. Case is submitted. Counsel is excused, and court is in recess until 9 tomorrow morning.